# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**Metalcraft of Mayville, Inc.,**
**d/b/a Scag Power Equipment**

       Plaintiff,

    v.                                          Case No. 2:16-cv-544

**The Toro Company,**

and

**Exmark Manufacturing Co., Inc.,**

       Defendants.

---

## MEMORANDUM IN SUPPORT OF SCAG'S
## MOTION FOR A PRELIMINARY INJUNCTION

In 2010, Plaintiff Metalcraft of Mayville, Inc. d/b/a Scag Power Equipment ("Scag") developed a unique system that insulates the operator of a riding lawn mower from bumps, vibrations and other forces that can make such operation debilitating over the course of hours, days and weeks of use.   In 2012, Scag was granted U.S. Patent 8,186,475 ("the '475 patent") for that system.

Defendant The Toro Company ("Toro") and its wholly owned subsidiary, Exmark Manufacturing Co., Inc. ("Exmark") (collectively "Defendants") are both competitors of Scag in the commercial lawn mower market.  Recognizing the value of Scag's idea, and wanting to continue to compete with Scag, Defendants took Scag's idea and created a competitive product that infringes the '475 patent.

A preliminary injunction is necessary to stop Defendants from stealing market share and customers from Scag by selling infringing products in direct competition with Scag. While Scag does not shy away from competition, it must be fair competition. Scag is now competing head-to-head with a much larger company with greater resources that is impermissibly using Scag's technology. Given that consumers of commercial lawn mowers tend to be very brand loyal, a loss of a sale to Toro or Exmark will likely result in that customer never purchasing a commercial lawn mower from Scag – irreparably harming Scag.

Scag is entitled to a preliminary injunction precluding Defendants from selling their infringing lawnmowers pending the final resolution of this case.

## Background

Metalcraft of Mayville was established in in Mayville, Wisconsin in 1922 as the Peerless Traveling Goods Company with luggage as its principle product. Crowson May 4, 2016 Decl., pg. 1, ¶ 2. Over time, the company's focus shifted to contract sheet metal fabrication. *Id*. Today, Metalcraft of Mayville employs over 500 factory and office personnel in two plants: the Mayville plant is over 400,000 square feet and the West Bend plant is about 230,000 square feet. *Id*.

In 1986, Metalcraft of Mayville purchased Scag, now one of the largest independent manufacturers of commercial mowing equipment in the world. Scag's innovation and quality is recognized throughout the industry. Crowson May 4, 2016 Decl., pg. 2, ¶ 3. Metalcraft of Mayville manufactures Scag mowers in both the Mayville and West Bend plants. *Id*.

Most people are generally familiar with riding lawnmowers, which are typically used to cut large areas of grass. Operators of riding lawnmowers involved in commercial enterprises – e.g., landscaping and golf course maintenance – often operate the mowers for extended periods

of time, day after day. This can be physically debilitating because operators are exposed to shocks, vibrations, and other forces that are generated by the lawnmower during use that result from driving the lawnmower across uneven terrain.

In 2010, Scag developed a suspended operator platform that greatly improved over existing prior art cushioning systems, many of which focused upon seat suspensions. These seat suspension configurations, however, left the operator susceptible to vibrations, shocks, and forces being transmitted through other components of the lawnmower, such as footrests.



In order to better insulate the operator from unwanted shocks, vibrations, and other forces, Scag developed a suspended operator platform, which is disclosed and claimed in the '475 patent. Crowson May 4, 2016 Decl., pg. 2, ¶ 4. In general terms, the operator seat is mounted on a suspended operator platform that has the ability to absorb and damp shock

impulses. The operator platform is attached via a linkage and shock absorption system ("shock system") to the frame of the lawnmower. In the embodiment shown below, the front linkage connects the front of the operator platform to the frame and the rear linkage connects the rear of the operator platform to the frame. The shock system in this embodiment includes a single coil-over type shock absorber (i.e., a shock absorber having a spring and a damper) that is attached at one end to the operator platform and at the other end to the frame to absorb shocks and vibrations that would otherwise be translated to the operator sitting on the platform.

Shortly after developing this technology, Scag commercialized the system disclosed and claimed in the '475 patent, offering the suspended operator platform as a feature in its newly created Cheetah line consisting of lawnmowers with various sizes of cutting decks, i.e., 48", 52", 61" and 72". Crowson May 4, 2016 Decl., pg. 2, ¶ 5. The 52" Cheetah is shown below (the deck size is not relevant to the '475 patent or to Scag's infringement claims here):



As explained on Scag's website, "[t]he entire operator platform (seat and foot plate) are suspended to deliver a smooth ride, with only three moving parts." Crowson May 4, 2016 Decl., pg. 2, ¶ 6. Below is a graphic from Scag's website illustrating the suspended platform, as well as a close-up photograph of the adjustment lever that allows the user to adjust the firmness of the suspension system as desired.

 

Since its introduction in 2010, the suspended operator platform has been a great success. Scag has sold about 15,000 Cheetah units, generating gross revenue of about $30 million. Crowson May 4, 2016 Decl., pg. 2, ¶ 7.

Scag sells its lawnmowers, including its Cheetah line to distributors who in turn sell to dealers. Crowson May 4, 2016 Decl., pg. 2, ¶ 8. Scag estimates that there are around 1100 dealers in its network. *Id.* Dealers typically carry products from multiple manufacturers, so it is not uncommon for Scag lawnmowers to compete head-to-head on the dealer floor with competitors' lawnmowers, including Toro and Exmark lawnmowers. *Id.*

Moreover, Scag, Toro and Exmark both have significant web presences including detailed web sites that tout the features and other aspects of their respective offerings. These websites allow prospective consumers to conduct comparisons without ever walking into a dealer location.

Given the head-to-head competition on web and the dealership floor, it is no coincidence that Toro and Exmark have now introduced a suspended operator platform to compete with Scag's Cheetah line. Exmark announced a limited launch of its suspended operator platform in a July 1, 2015 press release. Crowson May 4, 2016 Decl., pg. 3, ¶ 9. Then, due to apparent customer demand, Exmark subsequently announced in an October 21, 2015 press release that it was expanding the suspended operator platform for 2016 to additional lawnmower models. Crowson May 4, 2016 Decl., pg. 3, ¶ 10.

Exmark touts its suspended platform on the "Recent Innovations" page on its website. One of Exmark's lawnmowers featuring the suspended platform is shown below. Additionally, Exmark's promotional video provides a demonstration of the Exmark suspended platform system which shows the features establishing the infringement of the '475 patent. Exmark Video, Crowson May 4, 2016 Decl., Ex. C.



Toro similarly announced its suspension system in a November 2, 2015 press release, stating that "The Toro Company is excited to introduce the all-new MyRIDE™ suspension system available on select Toro® Z-Master® zero-turn mowers." Crowson May 4, 2016 Decl., pg. 3, ¶ 12. One example of a riding lawnmower featuring the MyRIDE suspension system is

shown below. Additionally, Toro's website also features a promotional video providing a detailed demonstration of the infringing Toro MyRIDE suspension system. Toro Video, Crowson May 4, 2016 Decl., Ex. E.

 

Prior to Toro's and Exmark's recent introduction of a suspended operator platform, Scag estimates that it had 100% of the market for riding lawnmowers with suspended operator platforms. Crowson May 4, 2016 Decl., pg. 3, ¶ 14.

<u>**Applicable Law**</u>

To obtain a preliminary injunction, the movant must show that it has a likelihood of success on the merits, that it will suffer irreparable harm if an injunction does not issue, that the harm it will suffer without an injunction is greater than the harm the opponent will suffer if the injunction is granted and that the public interest will not be disserved by the issuance of the injunction. *Reebok, Int'l v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed. Cir. 1988).

In patent cases, a reasonable likelihood of success requires a showing of validity and infringement. *Reebok*, 32 F.3d at 1555. To prove a likelihood of success on the merits, a patentee must prove that success in establishing infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525-26 (Fed. Cir. 2012). The patent infringement analysis consists of two steps. *Sunbeam Products, Inc. v. Homedics, Inc.*, 670 F. Supp. 2d 873, 884 (W.D. Wis. 2009). First, the patent claims must be interpreted or construed to determine their meaning and scope. *Id*. Second, the properly construed claims are compared to the process or product accused of infringing. *Id. citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The first step of this analysis, claim construction, is a matter of law reserved to the court. *Id. citing Markman* at 970–71. To establish infringement, plaintiffs must prove by a preponderance of the evidence that each claim element is present in the accused product, either literally or by equivalence. *Id. citing In re Gabapentin Patent Litigation*, 503 F.3d 1254, 1259 (Fed. Cir. 2007); *Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998). At the preliminary injunction stage, it is not the patentee's burden to prove validity. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) [citation omitted]. Rather, the patentee must show that the alleged infringer's invalidity defense lacks substantial merit. *Id*.

While there is a balancing of the four preliminary injunction factors, courts have afforded greater weight to the infringement/validity analysis when considering whether to enter preliminary injunctions in patent cases:

> In sum, it appears that the standard for issuing a preliminary injunction in a patent infringement case differs slightly from this standard in other type cases. Specifically, the burden of proving validity and infringement, i.e., "the likelihood of success on the merits" element, is greater. However, once this burden is met, the burden of proving the necessity for injunctive relief, i.e., the "no legal remedy" and "irreparable harm" elements, is

lesser. Finally, the integrity of the balancing of the equities performed by the Court in determining whether injunctive relief is appropriate remains intact.

*Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 470 (E.D. Wis. 1986) [citation omitted].

With respect to irreparable harm, there must be more than a mere possibility that the harm will come to pass, but the alleged harm need not be occurring or be certain to occur before a court may grant relief. *Centrifugal Acquisition Corp. v. Moon*, No. 09-C-327, 2012 WL 718999, at *1 (E.D. Wis. Mar. 5, 2012) [citations omitted]. A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. *Id.* A presently existing actual threat must be shown. *Id.* However, the injury need not have been inflicted when application is made or be certain to occur. *Id.*

## ARGUMENT

### I. SCAG IS LIKELY TO SUCCEED IN PROVING INFRINGEMENT OF CLAIMS 11, 14 AND 17

#### A. Toro's MyRIDE suspension system infringes claim 11

Scag does not believe there to be any claim construction issues with respect to claim 11. The claim is written in language that is easily understandable. Both a person having ordinary skill in the art of riding lawnmower design as well as laypersons can readily interpret the meaning of the claim. Thus, the claim terms of claim 11 should be given their plain and ordinary meaning.

Claim 11 begins by reciting standard components of a riding utility vehicle (in this instance a riding lawnmower), including a chassis that supports a drive train. Claim 11 further requires a seat that is supported by an operator platform. The operator platform is supported by a suspension system that connects the operator platform to the chassis by (i) a front linkage that extends angularly between the chassis and a front portion of the platform; and (ii) a rear linkage

that extends angularly between the chassis and a rear portion of the platform. The suspension system is configured so as to restrict movement of the back portion of the operator platform along a generally vertical travel path. These elements are identified in the screen shot from Toro's promotional video for its MyRIDE™ suspension system (available on Toro's website) as shown below:



With respect to the generally vertical travel path of the rear portion of the operator platform, Toro describes its MyRIDE™ suspension system as follows on its website:



**CONTROLLED SUSPENSION**

The suspension system is designed to eliminate side-to-side movement and control the pitch of the platform, allowing for a superior ride experience in varying terrain.

In other words, the MyRIDE™ suspension system is designed to restrict movement of the platform to a generally vertical path as described in the '475 patent. Further, Toro's MyRIDE™ promotional video demonstrates the operation of the MyRIDE™ suspension system, showing the rear portion of the operator platform moving in a generally vertical path relative to the chassis. Toro Video, Crowson May 4, 2016 Decl., Ex. E. (*see* section beginning at 40 second mark of video). Still further, as shown in the below screen shot from the video, the range of <u>vertical</u> <u>movement</u> between the operator platform and the chassis is 3.6 inches.



The vertical motion of the MyRIDE suspension system operator platform is also highlighted on Toro's website (excerpted below): "The fully suspended operator platform _allows for 3.6" of travel_ and reduces impacts, bumps and vibrations that reach the operator, resulting in a superior ride."



**MAXIMUM COMFORT**

The fully suspended operator platform allows for 3.6" of travel and reduces impacts, bumps and vibrations that reach the operator, resulting in a superior ride.

As further evidence of infringement, Scag has submitted herewith a detailed claim chart correlating the elements of claim 11 with Toro's MyRIDE™ suspension system. Toro Claim

Chart, Griggs May 5, 2016 Decl., Ex. A. Accordingly, it is more likely than not that Scag will prove infringement of claim 11.

**B.    Exmark's suspended platform infringes claim 11**

Exmark's infringing lawnmowers appear to be nearly identical, if not identical, to Toro's infringing lawnmowers. This is not surprising given that Exmark is a wholly owned subsidiary of Toro. Accordingly, the above infringement analysis for Toro's MyRIDE™ suspension system applies to Exmark's lawnmowers as well, and vice versa. Below are some still frames taken from Exmark's promotional video (available on Exmark's website: www.exmark.com) further confirming that the Exmark lawnmower embodies all of the structural limitations of claim 11.





Exmark's promotional video explains that the suspension system allows for "a full three and a half inches of vertical suspension," and that "trailing arms eliminate side-to-side sway, keeping motion vertical fore and aft," further confirming that the operator platform moves along a substantially vertical path. Exmark Video, Crowson May 4, 2016 Decl., Ex. C. (*see* section beginning at 1:35 minute mark of video).[1]

A detailed claim chart correlating the limitations of claim 11 with Exmark's suspension system is attached as Exhibit B to the May 5, 2016 Declaration of Michael T. Griggs. Scag is likely to succeed on its infringement claim against Exmark as to claim 11.

### C.     Toro's MyRIDE suspension system infringes claim 14

As with claim 11, Scag does not believe there to be any claim construction issues with respect to claim 14. The claim is written in language that is easily understandable by a both a

---

[1] These descriptions equally apply to Toro's MyRIDE™ suspension system.

person having ordinary skill in the art of riding lawnmower design and a layperson. Thus, the claim terms of claim 14 should be given their plain and ordinary meaning.

Claim 14 recites a utility vehicle (in this instance a riding lawnmower) having a chassis (with a front portion and a rear portion) that supports a drive train. There is a seat supported by an operator platform with a front portion and a rear portion. A linkage system connects the front portion of the operator platform to the front portion of the chassis, and the rear portion of the operator platform to the rear portion of the chassis. The linkage system allows for vertical movement of the operator platform with respect to the chassis while substantially preventing: (i) transverse (i.e., side-to-side) swaying; (ii) rolling (i.e., rocking side-to-side) of the operator platform from front to back; and (iii) yawing (i.e., twisting) of the operator platform.



As shown above, Toro's MyRIDE™ suspension system includes all of the physical elements of the claim. Moreover, as discussed above with respect to claim 14, Toro describes its MyRIDE™ suspension system as limiting side-to-side motion, i.e., it prevents swaying and

rolling. Further, the video of the MyRIDE™ suspension system in action shows that the operator platform moves vertically with respect to the chassis (the travel path is 3.6 inches along the vertical axis), and that operator platform does not sway, roll, or yaw. Scag has demonstrated that it is likely to succeed with respect to its infringement claim against Toro for claim 14. *See also*, Toro Claim Chart, Griggs May 5, 2016 Decl., Ex. A.

**D.      Exmark's suspension system infringes claim 14**

Exmark's suspension similarly infringes claim 14. As shown below, Exmark's Lazer Z line of lawnmowers that are equipped with a suspended operator platform embodies all of the physical elements of claim 14.



Moreover, Exmark's promotional video explains that the system is designed to eliminate side-to-side sway while keeping the motion of the system vertical. Exmark Video, Crowson May 4, 2016 Decl., Ex. C. (*see* 2:10 minute mark of video). Thus, Exmark's suspension operates in accordance with claim 14. In view of the above, Scag is likely to succeed as to its

infringement claim against Exmark with respect to claim 14.  *See also*, Exmark Claim Chart, Griggs May 5, 2016 Decl., Ex. B.

### E.     Toro's MyRIDE suspension system infringes claim 21

As with the previous claims, Scag does not believe there to be any claim construction issues with respect to claim 21.  The claim is written in language that is easily understandable by both a person having ordinary skill in the art of riding lawnmower design  and a layperson. Thus, the claim terms of claim 21 should be given their plain and ordinary meaning.

Claim 21 recites a riding utility vehicle (in this instance a riding lawnmower) that has a chassis that supports a drive train and a mower deck, which are typical components of a riding lawnmower.  As with the previous claims, there is a seat supported by an operating platform, and a suspension system that connects the operator platform to the chassis.  Each of these elements is shown above with respect to claims 11 and 14 and will not be repeated here.

Claim 21 further requires two stiffness adjusters: (i) a coarse-stiffness adjuster[2] that adjusts the suspension stiffness within a first range of stiffness settings, and (ii) a fine-stiffness adjuster that adjusts the stiffness setting within a second range of stiffness settings.  As explained in Toro's operator's manual, the MyRIDE™ suspension system includes two stiffness adjusters. Toro Operator's Manual, pp. 29-31, Sugden May 4, 2016 Decl., Ex. B.   The first, which is a coarse-stiffness adjuster, is associated with the front shock assembly:

**Adjusting the Front, Shock Assembly**

The front, shock assembly is set at the middle position and is normally not adjusted.

To adjust the front, shock assembly, open the floor pan and adjust it by using a spanner wrench (Toro part no. 132–5069) or a slip-joint pliers (Figure 40).

---

[2] The patent recites a "course" stiffness adjuster, which is obviously a typographical error – one that appears consistently throughout the patent.  As is clear from the context of the patent, the patentee intended to disclose and claim a "coarse" stiffness adjuster.



**Figure 40**

| 1. Middle position | 3. Soft ride |
|---|---|
| 2. Firm ride | |

There are three stiffness settings for the front shock assembly: soft ride, middle position (medium ride), and firm ride.

In addition to the front shock adjustment, the operator may also adjust the stiffness of the rear shock assembly:

## Adjusting the Rear, Shock Assemblies

The slots for the rear, shock assemblies have detent positions for reference. The rear, shock assemblies can be positioned anywhere in the slot, not just the detent positions.

The following graphic shows the position for a soft or firm ride and the different detent positions (Figure 38).



**Figure 38**

| 1. Firmest position | 3. Detents in the slots |
|---|---|
| 2. Softest position | |

There are five stiffness settings ranging from position 1 (firmest) to position 2 (softest). After setting the coarse stiffness (i.e., adjusting the front shock assembly) as described above, varying the rear shock assembly constitutes fine adjustment of the stiffness within a second range of settings.

Scag has demonstrated that it is likely to succeed on its infringement claim against Toro for claim 21. *See also*, Toro Claim Chart, Griggs May 5, 2016 Decl., Ex. A.

### F. Exmark's suspension system infringes claim 21

Exmark's suspension similarly infringes claim 21. As explained above, Exmark's Lazer Z lawnmower line that is equipped with a suspended operator platform includes a chassis that supports a drive train and a mower deck, a seat, and a suspension system that connects the operator platform to the chassis.

The Exmark operator platform suspension system further includes a coarse-stiffness adjuster, i.e., the front shock assembly, as explained in the Lazer Z operator's manual:



To adjust the front, shock assembly, open the floor pan and adjust it by using a spanner wrench (Part No. 132–5069) or a slip-joint pliers (Figure 25).

**Figure 25**

1. Middle position     3. Firm ride
2. Soft ride

Exmark Operator's Manual, pp. 36-38, Sugden May 4, 2016 Decl., Ex. C. The Exmark suspension system also includes a fine-stiffness adjuster, i.e., the rear shock assembly:



Figure 23

1. Firmest position
2. Softest position
3. Detents in the slots

**Note:** Ensure the left and right rear, shock assemblies are always adjusted to the same positions.

Adjust the rear, shock assemblies (Figure 24).

A detailed claim chart further confirms Exmark's infringement of claim 21. Exmark Claim Chart, Griggs May 5, 2016 Decl., Ex. B. In view of the above, Scag is likely to succeed as to its infringement claim against Exmark with respect to claim 21.

## II.    SCAG WILL SUFFER IRREPARABLE HARM

The irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm. *Id.*

Here, among other things, Scag will suffer irreparable harm in the form of lost market share in the suspended operator platform market. Scag was the first to market with its patented suspended platform technology, which is featured in Scag's Cheetah product line. Crowson May 4, 2016 Decl., pg. 3, ¶ 15. Toro and Exmark have now entered the suspended platform market and are competing head-to-head for sales. *Id.* Thus, every sale of a Toro or Exmark suspended

platform lawnmower can be characterized as a lost sale for Scag. And, these lost sales represent more than lost revenue. Customers within the commercial lawnmower market (which is an umbrella over the suspended operating platform lawnmower market) tend to be very brand loyal. Crowson May 4, 2016 Decl., pg. 4, ¶ 16. In other words, when a customer purchases an infringing suspended platform lawnmower from Toro or Exmark, they are likely to remain a Toro or Exmark customer with respect to future purchases. Thus, Scag will suffer irreparable harm because it is not only losing out on a sale (which would be compensable with money damages), it is losing out on a potential lifetime, loyal customer (the value of which is not quantifiable with money damages). Crowson May 4, 2016 Decl., pg. 4, ¶ 17.

Further, there is a direct nexus between the patented features, i.e., the suspended operator platform (claims 11 and 14) and the dual adjustability of the system (claim 21) and Defendants' sales of riding lawnmowers with suspended operating platforms. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (requiring a causal nexus between the infringement and the irreparable harm). Both Toro and Exmark offer comparable riding lawnmowers that do not include suspended operating platforms. Toro offers what appears to be the very same mower with and without the MyRIDE™ suspension system. Below is one example. Every MyRIDE™ mower has a comparable counterpart without the MyRIDE™ system. Sugden May 4, 2016 Decl., pg. 2, ¶ 5.



Commercial 3000 Series 60" (152 cm) 25.5 HP 852cc (74950)  Commercial 3000 MyRide 60" (152 cm) 25.5 HP 852cc (74996)

Thus, when a customer purchases a lawnmower with a MyRIDE™ suspension system, it is fair to presume that the MyRIDE™ suspension system drove the sale of that lawnmower because the customer had the option to purchase a lawnmower with the exact same features, but without the MyRIDE™ suspension system.

Exmark similarly offers its suspension platform as an upgrade to its Lazer Z Series lawnmowers. Sugden May 4, 2016 Decl., pg. 2, ¶ 7. (Exmark's website states: "With the goal of maximizing productivity through increased operator comfort, the suspended operator platform is now available on 2015 Lazer E-Series and Lazer Z X-Series zero-turn mowers as a factory-installed upgrade."). Thus, as with Toro, the suspended platform drives the purchase of the lawnmower because customers have the option of purchasing the same lawnmower without the suspension system, yet choose to purchase the lawnmower with the suspended operator platform.

Accordingly, there is a direct nexus between Toro's and Exmark's sales of suspension platform lawnmowers and the infringing suspension systems. The customer demand for the patented suspension system is further confirmed in Exmark's own press release, which states that after launching the system on a 60-inch mower, "[a]lmost immediately [Exmark] began to receive calls, emails and social media messages inquiring about the platform's availability with other cutting deck widths." Exmark Oct. 21, 2015 Press Release, Crowson May 4, 2016 Decl., Ex. B. By Exmark's own admission, the suspended operator platform is a sought-after feature.

Still further, given that Scag had the vast majority of the market for suspended operator's platforms in the commercial lawn mower market prior to Toro's and Exmark's entry into the market, a customer's negative experience with a Toro or Exmark mower of this type would almost, by necessity, harm Scag's sale of the platform. Crowson May 4, 2016 Decl., pg. 4, ¶ 18. Indeed, customers having such a negative experience are likely to post disparaging comments

online or, by word of mouth, share their unflattering opinion in a manner that would irreparably harm Scag's ability to continue to develop the market and make such sales. *Id.*

Finally, Scag has made a substantial investment in the development, manufacture and sale of the Cheetah mower line – a line entirely devoted to exploiting the value of the suspended operator platform feature. A loss of that market as a result of Defendants' infringement would deny Scag the value of its investment – something not compensable through patent damages – so as to irreparably harm Scag.

The Federal Circuit has recognized that "[e]xclusivity is closely related to the fundamental nature of patents as property rights [and] is an intangible asset that is part of a company's reputation." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Therefore, "[w]here two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." *Id.* "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

Here, Scag will suffer irreparable harm if a preliminary injunction is not entered. As it stands now, Scag is unfairly being forced to compete against Toro and Exmark lawnmowers that incorporate – and tout – Scag's patented suspension system, which is experiencing high customer demand. This is undoubtedly resulting in lost sales to Scag, and the diversion of loyal customers from Scag to Toro or Exmark.

## III. THE BALANCE OF HARDSHIPS WEIGHS STRONGLY IN SCAG'S FAVOR

Should the Court forego a preliminary injunction, Toro and Exmark would be permitted to capture market share from Scag by selling infringing lawnmowers. Rather than engaging in

fair competition, Scag would be subjected to unfair competition against Toro's and Exmark's infringing products. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) ("requiring [patentee] to compete against its own patented invention… places a substantial hardship on [the patentee]"). This unfair competition and Toro's and Exmark's anticipated ill-gotten market gains places a significant hardship on Scag that outweighs any hardship on Toro or Exmark.

## IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION

The Court of Appeals for the Federal Circuit addressed the public interest in enforcing patents in *Celsis*:

> The public interest favors the enforcement of Celsis' patent rights here. *See Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed.Cir.2006) ("We have long acknowledged the importance of the patent system in encouraging innovation."). Such investment in drug research and development must be encouraged and protected by the exclusionary rights conveyed in valid patents. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362–63 (Fed.Cir.2008). That incentive would be adversely affected by taking market benefits away from the patentee and giving them to the accused infringer in this case. *See id*. Though LTC argues that it sells products for drug research and development such that the public interest would disfavor enjoining LTC, both LTC and Celsis sell the same products and are in direct competition. In other words, the public can obtain the products from Celsis.

*Celsis*, 644 F.3d at 931-32.

Similar to *Celsis*, Scag, Toro and Exmark sell similar products and are in direct competition with one another. Thus, should a preliminary injunction be entered, the public can obtain the patented suspension system from Scag. Or, the public could purchase non-infringing zero-turn riding lawnmowers from Toro or Exmark. There is no countervailing public interest in allowing Toro and Exmark to continue selling lawnmowers equipped with infringing suspension systems.

## V.     Conclusion

WHEREFORE, Scag respectfully requests that this Court *grant* its motion and *enter* a preliminary injunction precluding Toro and Exmark from making, using, selling and offering to sell lawnmowers equipped with the infringing platform suspension system.

Dated:  May 5, 2016                    s/Michael T. Griggs
                                       Adam L. Brookman
                                       Michael T. Griggs
                                       Sarah M. Wong
                                       BOYLE FREDRICKSON, S.C.
                                       840 N. Plankinton Ave.
                                       Milwaukee, WI  53203
                                       Telephone:  414-225-9755
                                       Facsimile:  414-225-9753
                                       *Attorneys for Plaintiff Metalcraft of Mayville, Inc.*